IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| AUBREY R. ACKLES, | ) Case No. 3:19-cv-1458 |
| | ) |
| Plaintiff, | ) JUDGE JAMES G. CARR |
| | ) |
| v. | ) MAGISTRATE JUDGE |
| | ) THOMAS M. PARKER |
| COMMISSIONER OF | ) |
| SOCIAL SECURITY, | ) |
| | ) **REPORT & RECOMMENDATION** |
| Defendant. | ) |

### I. Introduction

Plaintiff Aubrey Ackles seeks judicial review of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income benefits ("SSI") under Titles II and XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because substantial evidence supported the ALJ's decision and Ackles has failed to identify any improperly applied legal standards, I recommend that the Commissioner's final decision denying Ackles's applications for DIB and SSI be AFFIRMED.

### II. Procedural History

On April 4, 2014, Ackles applied for DIB, and on April 15, 2014 she applied for SSI. (Tr. 332, 339).[1] She alleged that she became disabled in April 2013 due to the conditions of: "manic depression, kleptomaniac," panic attacks, mood disorder, "mental," obesity, diabetes –

---

[1] The administrative transcript is in ECF Doc. 10.

type 2, and high blood pressure. (Tr. 332, 339, 405). The Social Security Administration denied Ackles's applications initially and upon reconsideration. (Tr. 72, 86, 100, 116). Ackles requested an administrative hearing. (Tr. 198). ALJ Timothy Keller initially heard Ackles's case and denied her claims in an August 21, 2017 decision. (Tr. 132-148). The Appeals Council issued a remand order vacating ALJ Keller's decision on June 27, 2018. (Tr. 155).

ALJ Terry Banks held another hearing on December 4, 2018 (Tr. 38-71) and issued a decision on March 4, 2019 denying Ackles's claims. (Tr. 15-26). On April 25, 2019, the Appeals Council denied further review, rendering ALJ Banks's decision the final decision of the Commissioner. (Tr. 1-3). On June 24, 2019, Ackles filed a complaint seeking judicial review of the Commissioner's decision. ECF Doc. 1.

**III.** **Evidence**

    **A.** **Relevant Medical Evidence**

Because Ackles raises only a single issue concerning the ALJ's handling of the opinion of a state agency doctor concerning Ackles's mental health, it is unnecessary to summarize the entirety of the 2,500-page administrative record. However, the undersigned has reviewed the record and the parties' briefs in order to prepare this R&R.

On April 5, 2011, Ackles underwent an adult diagnostic assessment. (Tr. 544-551). At the time, Ackles was overweight and struggling with following a diabetic diet; she had joint pain due to her weight; and she felt depressed daily. (Tr. 548). Ackles was diagnosed with a dysthymic disorder and assigned a global assessment of functioning ("GAF") of 61. (Tr. 550).

In March 2014, Ackles had a flat and anxious affect and appeared depressed. (Tr. 674). In April 2014, Ackles presented crying and scared. She wanted to resume her prior medication, Effexor, because Celexa was not working. (Tr. 677).

Ackles saw Dr. Young Wung Rhee on April 8, 2014.  Ackles reported being depressed for over 10 years.  Dr. Rhee increased Ackles's medications and recommended counseling. Ackles scheduled counseling for April 14, 2014, but she did not show up and never called back to reschedule.  (Tr. 642).  In March 2015, Dr. Rhee reduced Ackles's medication and noted that she was working 16 hours a week at a home health company.  (Tr. 760).

Ackles was admitted to the hospital on August 4, 2015 after making suicidal threats during an argument with her husband.  (Tr. 1235).  She admitted that she did not always take her medication.  (Tr. 1241, 1247).  At admission, Ackles had fair grooming with sores on her arms and face and a depressed mood.  She was cooperative, attentive, and had good eye contact, with clinically adequate concentration, intact memory and fair insight and judgment.  (Tr. 1237-1238). Over the course of her hospitalization, Ackles's affect and mood improved and she demonstrated increased insight and awareness.  (Tr. 1260).  Ackles stated that she could not participate in an outpatient behavior health integration program because it would interfere with her job.  (Tr. 1267).  Ackles was discharged on August 7, 2015.

Ackles saw Dr. Rhee on August 13, 2015.  She reported that her depression was better, but she was still experiencing mood and sleep problems.  On September 23, 2015, Ackles reported to Dr. Rhee that she was working 20 hours per week, but she was not doing well.  (Tr. 760).

On April 29, 2016, Ackles's manager, Dawn Good, wrote a letter stating that Ackles had been removed from her position as scheduler due to her health and frequent attendance issues. Ackles was assigned work as a home health aide because that position was more flexible.  (Tr. 818).

3

On August 28, 2016, Ackles was hospitalized again for acute situational stress and an unintentional overdose on medication. (Tr. 1000, 1006, 1008). Ackles reported suicidal thoughts with no plans. She said that she had lost her job due to her ex-husband, but that she had been able to get another job. (Tr. 1000-1001). John Kamau, M.D., diagnosed major depressive disorder, severe, and adult situational stress disorder. (Tr. 1004). Ackles was discharged on August 31, 2016 in an improved, stable condition and after doing well on medication. (Tr. 1009).

During a diagnostic assessment in September 2016, Ackles reported many situational stressors, including her relationship with her husband. (Tr. 1180). In describing her employment history, Ackles reported that her attendance at work was "normal," with average performance. (Tr. 1182). She said that she had worked for the past five years in home health. (Tr. 1183). Ackles appeared mildly depressed with a circumstantial thought process, but she had normal speech, demeanor, behavior, thought content, memory, attention and concentration. (Tr. 1191-1192).

On December 28, 2016, Ackles saw Sheetal Dhoke, M.D., at Coleman Psychiatry. She reported mood swings, with two weeks happy and two weeks of depression. She also reported panic attacks lasting fifteen minutes and said she was stressed due to marital issues. (Tr. 1164). Dr. Dhoke observed an anxious mood, constricted affect and limited or fair insight and judgment, but normal appearance, demeanor, behavior, eye contact, speech, thought process memory, attention and concentration. (Tr. 1168-1169). Dr. Dhoke adjusted Ackles's medications. (Tr. 1171).

On March 16, 2017, Ackles's affect was flat and her mood was depressed, but she was cooperative with calm motor activity and normal eye contact. (Tr. 1889). On April 21, 2017,

4

Ackles reported that her medications were effective and that she was doing "ok," but was having problems with panic attacks and anxiety due to her recent divorce. (Tr. 1145).

On May 9, 2017, Dr. Rhee wrote a letter indicating that he had not seen Ackles since August 10, 2016. She had been scheduled to return but did not show up and/or cancelled her appointments. (Tr. 1131).

On May 15, 2017, Ackles went to the emergency room complaining of shortness of breath and anxiety. (Tr. 1202). On June 2, 2017, Ackles told Dr. Dhoke that she felt better and that her anxiety and depression were under control, but she was not sleeping well and felt tired during the day. (Tr. 1135). Her mental status exam was mostly normal. (Tr. 1136-1137). On August 25, 2017, Ackles reported increased anxiety and depression. She was having difficulty reducing her caffeine intake and monitoring her blood sugar. (Tr. 2341).

On January 17, 2018, Ackles reported that her best friend had died in her arms. Ackles was depressed and tearful. However, mental status examination showed that she had normal judgment, insight, eye contact, attitude, motor activity and speech. (Tr. 2357-2358).

On March 29, 2018, Ackles had a flattened affect, but otherwise normal mental status examination. In April 2018, Ackles went to the emergency room for abdominal pain. She also complained of anxiety and headaches. Ackles appeared anxious but her speech, behavior and thought content were normal. (Tr. 2433-2437). In July and September 2018, Ackles denied any anxiety or depression and had mostly normal mental status examinations. (Tr. 2490, 2505).

  **B.**  **Relevant Opinion Evidence**

    **1.**  **Treating Physician – Dr. Young Rhee**

On May 7, 2014, treating physician, Dr. Rhee, wrote a letter on Ackles's behalf. Dr. Rhee stated that Ackles had reported being depressed for over ten years. (Tr. 642). In a

5

questionnaire, Dr. Rhee noted that Ackles was moody, anxious and had a flat affect, but did not have delusions.  She had an obese, clean appearance, intact memory and average attention, concentration judgment and insight.  Dr. Rhee opined that Ackles was only mildly impaired in her ability to: remember, understand and follow directions; maintain attention; sustain concentration, persist at tasks, and complete them in a timely fashion. (Tr. 638).  Dr. Rhee had only seen Ackles once when he wrote the letter and completed this questionnaire. (Tr. 642).

Three months later, on August 20, 2014, Dr. Rhee completed another mental status questionnaire. (Tr. 733-735).  Dr. Rhee noted that Ackles was obese, clean and appropriately dressed.  Her mood was low, depressed and her affect was flat. (Tr. 733).  He indicated that he had seen Ackles on three occasions.  He noted that she was easily distracted, but opined that she had moderate limitations in maintaining attention, concentration, persistence and completing tasks in a timely fashion. (Tr. 734).

On October 28, 2015, Dr. Rhee wrote another letter documenting his treatment of Ackles. (Tr. 759-760).  Dr. Rhee's letter documents several visits with Ackles.  On August 13, 2015, Ackles reported that she had been hospitalized for four days due to depression and overdose.  Dr. Rhee diagnosed depressive disorder, cyclothymia, ADHD, an anxiety disorder and a personality disorder. (Tr. 760).

On May 17, 2016, Dr. Rhee completed a treating source statement regarding Ackles's psychological conditions. (Tr. 812-816).  Dr. Rhee opined that Ackles was "able to maintain regular attendance and be punctual within customary tolerances," but that she would be absent about three days per month due to impairments or treatments and would be off-task 15% of the work day. (Tr. 815, 816).  Dr. Rhee noted that Ackles's hospitalization in August 2015 was

6

related to worsening symptoms because she stopped taking her medications for two to three months. (Tr. 815).

### 2. Examining Physician

Michael J. Wuebeker, Ph.D., performed a psychological examination of Ackles on June 4, 2014. (Tr. 678-684). Ackles reported some paranoia about what others were saying about her and that she was depressed. She was scratching herself more when she was stressed. She stated that medication helped some. (Tr. 680-681). Ackles reported some suicidal ideation and panic attacks. She was cooperative and maintained adequate eye contact during the examination. Dr. Wuebeker observed that Ackles's hands were shaking; she stated that she was nervous. (Tr. 681). Dr. Wuebeker redirected Ackles a couple of times to stay on topic, but she completed serial sevens, correctly calculated change, and counted backwards. Her speech was normal, with adequate memory, insight and judgment. (Tr. 681, 682). Dr. Wuebeker diagnosed depressive and anxiety disorders. (Tr. 683). He opined that Ackles's mental health impairments would negatively impact her abilities to maintain attention, concentration, persistence and pace. She had some difficulties with those skills during the examination. (Tr. 684).

### 3. State Agency Physicians

On June 6, 2014, state agency reviewing psychologist, Courtney Zeune, Psy.D., reviewed Ackles's records and concluded that Ackles was capable of completing simple and some multi-step tasks requiring short periods of focus in a setting that did not require rapid pace or strict production quotas. (Tr. 81). She also found that Ackles was capable of adapting to most routine changes and stressors in the work place. (Tr. 82).

On September 20, 2014, state agency reviewing psychologist, Deryck Richardson, Ph.D., reviewed Ackles's records, including new evidence, and found that Ackles was more limited

than had been opined by Dr. Zeune. Of most relevance to this appeal, Dr. Richardson found that "occasional absences are expected due to severity of [Ackles's] symptoms." (Tr. 111, 127).

### C. Relevant Testimonial Evidence

Ackles testified at the ALJ hearing. (Tr. 42-61). She lived in a house with her ex-husband. (Tr. 43). She had a driver's license, but did not drive regularly. (Tr. 43). She had a high school education. Ackles had worked for a home health care company earlier in the year, but she was not working at the time of the hearing. (Tr. 44). She had prior work experience as a state tested nursing assistant and as an office helper. (Tr. 45-47).

Ackles had been terminated from her most recent home health job in April 2018 because she was absent and tardy. (Tr. 47). Ackles reported that she had been absent due to her severe diabetes, incontinence in the office, and problems with her hands and feet going numb. (Tr. 48). She had also lost an office job due to absences; Ackles was missing three to five days per month due to physical and mental illness. (Tr. 49-50). That employer had changed her work duties to part-time care of a client who was "not hard to take care of." (Tr. 50).

Ackles testified that she would have a hard time working due to her morbid obesity and skin problems. (Tr. 53-54). She was also treating her mental illness; she saw a doctor for medication changes every three months and a counselor once a month. (Tr. 54). She had sores on her body from scratching them when she was worried. (Tr. 59). Her daughter came to her house every day to help her with taking her medications, bathing and getting dressed. (Tr. 56). Ackles's medications caused sleepiness and difficulty concentrating. (Tr. 60).

Vocational Expert ("VE") Sandra Steele also testified at the hearing. (Tr. 60-70). The ALJ asked the VE to consider a hypothetical individual with Ackles's same work experience who was able to do a full range of medium exertion work, except she could occasionally climb

ramps and stairs, she could never climb ladders, ropes, or scaffolds; she could frequently stoop, and occasionally kneel, crouch, and crawl. She could not be exposed to unprotected heights. Mentally, she was limited to performing simple routine and repetitive tasks, but not at a production rate pace; she was limited to work-related decisions; no more than occasional changes in the workplace tasks and setting, and any changes must be well-explained in advance. Finally, she was limited to occasional contact with supervisors, and occasional and superficial contacts with co-workers and members of the public. (Tr. 64).

The VE testified that this hypothetical individual could perform jobs such as janitor, cafeteria or dining room attendant, and laundry worker. If limited to light work, she could perform jobs such as retail marker, general office clerk, and dishwasher. (Tr. 65). At the sedentary level, she could perform the jobs of general office helper, mail and addressing clerk, and surveillance or security monitor. (Tr. 66). The VE opined that employers would tolerate up to 15% off-task time and one absence for illness per month. (Tr. 66-67).

**IV.   The ALJ's Decision**

The ALJ made the following findings relevant to this appeal:

5.  Ackles had the residual functional capacity to perform medium work except she could occasionally climb ramps and stairs; could never climb ladders, ropes or scaffolds; could frequently stoop; occasionally kneel, crouch and crawl; and could never be exposed to unprotected heights. She could perform simple, routine, and repetitive tasks, but not at a production rate pace; she could make work-related decisions; could have occasional changes in the workplace tasks and setting if changes were well-explained in advance; she could have occasional contact with supervisors and occasional, superficial contact with co-workers and members of the public. (Tr. 19-20).

9. Considering her age, education, work experience, and residual functional capacity, there were jobs existing in significant numbers in the national economy that Ackles could perform. (Tr. 25).

9

Based on all his findings, the ALJ determined that Ackles had not been under a disability since April 4, 2013, the onset date of her alleged disability. (Tr. 26).

## V. Law & Analysis

### A. Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion. *Rogers*, 486 F.3d at 241; *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) ("Substantial evidence supports a decision if 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' backs it up." (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971))).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). If supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court might reach a different conclusion or if the evidence could have supported a different conclusion. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."); *Biestek*, 880 F.3d at 783 ("It is not our role to try the case *de novo*." (quotation omitted)). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

10

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting Sarchet v. Charter, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321, 2010 WL 2929562 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant

11

can perform his past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. §§ 404.1512(a), 416.912(a).

### B. Opinion of Reviewing Physician, Dr. Richardson

Ackles argues that the ALJ improperly evaluated the opinion of the state agency reviewing physician, Dr. Richardson, who reviewed Ackles's record at the reconsideration level. At Step Four, an ALJ must weigh every medical opinion that the Social Security Administration receives. 20 C.F.R. §§ 404.1527(c), 416.927(c). An ALJ must give a treating physician's opinion controlling weight, unless the ALJ articulates good reasons for discrediting that opinion. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); *see also Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506-07 (unpublished) (noting that two or three visits "often will not suffice for an ongoing treatment relationship" required for a physician to be a treating source). On the other hand, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'" *Gayheart*, 710 F.3d at 376. Instead, an ALJ must weigh such opinions based on: (1) the examining relationship; (2) the degree to which supporting explanations consider pertinent evidence; (3) the opinion's consistency with the record as a whole; (4) the physician's specialization related to the medical issues discussed; and (5) any other factors that tend to support or contradict the medical opinion. *Id.*; 20 C.F.R. §§ 404.1527(c), 416.927(c). Generally, an examining physician's opinion is due more weight than a

nonexamining physician's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Gayheart*, 710 F.3d at 375. An ALJ does not need to articulate good reasons for rejecting a nontreating or nonexamining opinion. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (declining to address whether an ALJ erred in failing to give good reasons for not accepting non-treating physicians' opinions).

Ackles presents a single narrow issue for appeal. She argues that the ALJ erred by rejecting Dr. Richardson's opinion that she would have "occasional" absences due to the severity of her symptoms. (Tr. 111, 127). The Appeals Council remanded the first ALJ's decision, in part, based on his inconsistent treatment of Dr. Richardson's opinion. (Tr. 157-158). He had assigned significant weight to Dr. Richardson's opinion, but apparently ignored the portion of his opinion regarding occasional absences. (Tr. 145-146).

On remand, ALJ Banks assigned only partial weight to Richardson's opinion and specifically addressed the opinion regarding absenteeism, stating:

> Deryck Richardson, Ph.D., state psychological consultant at the reconsideration level, adopted the opinion of Dr. Zeune except that Dr. Richardson found that the claimant would be limited to interaction on an occasional and superficial basis, would be limited to work in a routine setting with few and infrequent changes, and would be absent occasionally due to severity of symptoms. (5A;7A). Partial weight is given to Dr. Richardson's opinion. While Dr. Richardson opined that claimant would have occasional absences due to her symptoms, this aspect of Dr. Richardson's opinion is vague. If meant in vocational terms, it would mean that the claimant would be absent one-third of the time. If this was the intent of Dr. Richardson's opinion, he would have indicated that the claimant was not employable. Thus, I find that the use of the word occasional to qualify the claimant's absences is vague. However, all other aspects of Dr. Richardson's opinion is [*sic*] consistent with the evidence described above. Therefore, partial weight is given to Dr. Richardson's opinion.

(Tr. 23).

The ALJ was not required to assign controlling weight to any aspect of Dr. Richardson's opinion. Nor was he required to provide good reasons for the weight he assigned to it. Even so,

13

he explained why he did not adopt Dr. Richardson's opinion that Ackles would have occasional absences: because it was vague. And it was. As explained by the ALJ, Dr. Richardson could not have intended that Ackles would be absent more than employers would tolerate because, if he had, he would have also been forced to opine that Ackles was disabled and unable to work. But he didn't. (Tr. 113). Rather, Dr. Richardson opined that, with some limitations, Ackles was not disabled and could work. (Tr. 110-113).

Ackles argues that, because Dr. Richardson is an expert in disability evaluation, he uses certain words, such as "occasional," as terms of art defined by the Social Security regulations. "Occasionally," in the Social Security context is generally defined as occurring "very little to no more than one-third of the time." *See, e.g.,* SSR No. 85-15, 1985 SSR LEXIS 20. However, the word "occasionally" is generally used to describe the ability to perform activities that are involved in specific jobs. For example, if a person can stoop occasionally (from very little up to one-third of the time) in order to lift objects, the sedentary and light occupational base is virtually intact. SSR 96-9p, 1996 SSR LEXIS 6. Another example: being on one's feet is required 'occasionally' at the sedentary level of exertion. Thus, "periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday ..."); Woodard v. Comm'r. of Soc. Sec., 2013 U.S. Dist. LEXIS 20369, 2013 WL 592382 at *4 (S.D. Ohio, Feb. 14, 2013). Conversely, when opining on the number of days a claimant will be absent, most Social Security experts quantify their opinions by the number of days the individual will be absent per month, not with terms such as "frequently," "occasionally" and "rarely." For example, here the VE testified that most employers will tolerate one absence *per month.* (Tr. 66). She did not state that employers will tolerate "occasional" absences. Such an answer would have been vague.

14

As argued by the Commissioner, it was proper for the ALJ to reject Dr. Richardson's opinion as vague. The ALJ is not required to accept a non-treating physician's vague opinion. *See Gaskin v. Comm'r of Soc. Sec.,* 280 F. App'x 472, 476 (6th Cir. 2008); *Dooley v. Comm'r of Soc. Sec.,* 656 F. App'x 113, 117 (6th Cir. 2016); *Quisenberry v. Comm'r of Soc. Sec.* 757 F. App'x 422, 431, 434 (6th Cir. 2018). The ALJ was under no obligation to contact Dr. Richardson for clarification. He was permitted to reject the vague opinion without further clarification. *See Dooley,* 656 F. App'x at 122.

Ackles argues that the ALJ's reasoning – that Dr. Richardson did not actually "mean what he said" – "created a conflict with Dr. Richardson's status as a disability expert." ECF Doc. 12 at 9. But, as the ALJ determined, it is also possible (and more logical) that Dr. Richardson used the word "occasional" in its, normal, non-Social Security context when he described Ackles's anticipated absences. Why is this more logical? The ALJ stated the reason – because Dr. Richardson would have necessarily been opining that Ackles could not work in *any* job if he had used "occasional" in the way it is used to describe how much physical or mental ability is required for a particular job. The ALJ's evaluation of Dr. Richardson's opinion did not undermine Dr. Richardson's status as an expert. Nor was the ALJ's evaluation of Dr. Richardson's opinion "extremely selective." Rather, the ALJ's evaluation logically reconciled Dr. Richardson's statement that Ackles would have "occasional" absences with his opinion that she was not disabled.

Ackles contends that portions of the record support Dr. Richardson's finding that she would have "occasional" absences of up to one third of the time. Ackles cites Dr. Rhee's opinion that she would be off task 15% of the day, and Dr. Wuebker's opinion that her mental health would negatively impact her ability to maintain attention and concentration as well as her

15

persistence and pace.  Ackles also cites treatment notes reflecting her past absences from work.  But the ALJ discussed the opinions of Dr. Rhee and Dr. Wuebeker, and Ackles has not argued that he improperly weighed them.  Nor has Ackles argued that the records cited by the ALJ were incorrect.  Instead, her argument is that the ALJ should have assigned more weight to different record evidence.  But even if portions of the record support Ackles's claim that she will experience work-precluding absences, there was also substantial evidence supporting the ALJ's finding that Ackles's absences will not preclude all work.  The ALJ cited the following evidence supporting his decision:

> Despite the opinion of the claimant's attorney that the claimant would be impermissibly absent from work due to her mental health symptoms and abscesses, the evidence does not support this allegation.  With regard to the claimant's mental impairments, as described above, the claimant's mental status examinations generally revealed normal findings, and the claimant stopped receiving mental health treatment in June 2017.  (24F; 25F).  Furthermore, any exacerbation of the claimant's mental health symptoms was generally due to the claimant's non-compliance with prescribed medication and was situational in that it related to her divorce.  (*Id.*)  With regard to the claimant's alleged absences due to her diabetes mellitus related abscesses, the claimant's abscesses occur periodically and there is no record evidence that they would [] cause excessive absences.

(Tr. 24).

      I find that the ALJ's decision is supported by substantial evidence.  That finding, should the Court concur, requires that the ALJ decision must be affirmed.  "The scope of our review is limited to an examination of the record only.  We do not review the evidence de novo, make credibility determinations nor weigh the evidence." *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989).  Ackles has failed to identify any misapplication of legal standards in ALJ Banks's consideration of the state-agency reviewing physician's opinion.

16

**VI.     Recommendations**

Because substantial evidence supports the ALJ's decision that Ackles's absences would not preclude all work and because Ackles has failed to identify any misapplication of legal standards, I recommend that the Commissioner's final decision denying Ackles's applications for DIB and SSI be AFFIRMED.

Dated: April 7, 2020

　　　　　　　　　　　　　　　　　　　　　Thomas M. Parker
　　　　　　　　　　　　　　　　　　　　　United States Magistrate Judge

_____

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).